**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-2213

LORENZO M. PLEDGER, SR.,

Plaintiff – Appellant,

v.

LORETTA LYNCH; CHARLES SAMUELS, JR; J.F. CARAWAY; UNITED STATES
OF AMERICA; MR. WEAVER; MRS. GROVE; E. ANDERSON; NURSE JOSHUA
HALL; ALICIA WILSON; ANDREA HALL; ST. JOSEPH'S HOSPITAL,

Defendants – Appellees,

and

CHARLES WILLIAMS; DR. TODD SAVIDGE; JOHANNA LEHMANN; ANDREA
SMITH-POSEY; MS. RUTHIE CARSON; SABRINA HUDNALL; SALVATORE
LANASA,

Defendants.

Appeal from the United States District Court for the Northern District of West Virginia, at
Elkins.  John Preston Bailey, District Judge.  (2:16-cv-00083-JPB)

Argued:  May 6, 2021                                      Decided:  July 21, 2021

Before GREGORY, Chief Judge, and HARRIS and QUATTLEBAUM, Circuit Judges.

Reversed in part, vacated in part, and remanded by published opinion.  Judge Harris wrote
the opinion, in which Chief Judge Gregory joined.  Judge Quattlebaum wrote a separate
opinion, concurring in part and dissenting in part.

**ARGUED:** David Kendall Roberts, O'MELVENY & MYERS LLP, Washington, D.C., for Appellant. Maximillian Fitzsimmons Nogay, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia; Christine Sayre Vaglienti, WEST VIRGINIA UNIVERSITY HOSPITALS, INC., Morgantown, West Virginia, for Appellees. **ON BRIEF:** Shannon Barrett, Ally Scher, O'MELVENY & MYERS LLP, Washington, D.C., for Appellant. William J. Powell, United States Attorney, Tara N. Tighe, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Federal Appellees.

PAMELA HARRIS, Circuit Judge:

Lorenzo Pledger, incarcerated in federal prison, alleges that prison officials ignored his repeated medical complaints and denied him meaningful treatment, leading to his collapse and major surgery. Pledger sued for damages in federal court in West Virginia, raising two claims relevant on appeal: a Federal Tort Claims Act ("FTCA") claim against the United States, alleging medical negligence; and a *Bivens* claim against certain individuals involved in his care, alleging deliberate indifference in violation of the Eighth Amendment.

The district court dismissed the FTCA claim because Pledger did not secure a certification from a medical expert before filing suit, as required by West Virginia law. *See* W. Va. Code § 55-7B-6. This was in error. As two of our sister circuits have concluded, state-law certification requirements like West Virginia's are inconsistent with the Federal Rules of Civil Procedure, and thus displaced by those rules in federal court. Accordingly, we reverse the district court's dismissal of Pledger's FTCA claim.

The district court also granted summary judgment to the individual defendants on Pledger's *Bivens* claims, reasoning that Pledger could not establish deliberate indifference as a matter of law. But the district court did not first provide Pledger, a pro se plaintiff, with proper notice of his obligation to support his claims or an opportunity to seek discovery. For that reason, we vacate this portion of the district court's judgment and remand for further proceedings on the *Bivens* claims.

3

## I.

## A.

Lorenzo Pledger was incarcerated at FCI Gilmer, a federal prison in West Virginia, from April 2014 to February 2016.[1]  Before his arrival, Pledger was diagnosed with Crohn's disease, a chronic inflammatory bowel disease characterized by inflammation of the digestive tract.  *See Crohn's Disease*, Nat'l Inst. of Diabetes & Digestive & Kidney Diseases, https://www.niddk.nih.gov/health-information/digestive-diseases/crohns-disease/all-content (last visited June 29, 2021) (hereinafter "NIDDK"); *see also Pledger v. Lynch* (*Pledger I*), No. 2:16-cv-83, 2018 WL 5905893, at *3 n.2, *39 n.69 (N.D. W. Va. Aug. 16, 2018).  Symptoms include diarrhea, abdominal cramping and pain, and weight loss.  *See* NIDDK, *supra.*  If left untreated, Crohn's disease can cause serious complications, such as intestinal obstructions and life-threatening bleeding.  *Id.*  Crohn's disease is episodic, characterized by periods of remission and periods of "flare-ups."  *Id.*  Although there is no cure, medication can treat symptoms, reduce inflammation, and prevent flare-ups.  *Id.*

Upon arrival at FCI Gilmer, Pledger informed Dr. Eddie Anderson, a staff physician, that he had Crohn's disease but was not taking any medication to control it.  Just

---

[1] Pledger appeals from an order granting summary judgment on claims arising from the care he received while incarcerated.  Although we hold that summary judgment was premature in this case, we nevertheless recount the facts and reasonable inferences that can be drawn from them in the light most favorable to Pledger, the non-moving party.  *See McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 481 n.1, 487 (4th Cir. 2014) (presenting facts under this standard even while holding that summary judgment was premature).

4

a few months later, in June 2014, Pledger began to experience a flare-up of his Crohn's symptoms. As he reported his distress to providers at FCI Gilmer over the next several months, they prescribed a variety of medications. When he reported continuing abdominal pain in March 2015, Pledger agreed to be scheduled for a colonoscopy and gastroscopy, which were conducted in May at St. Joseph's Hospital. No sign of active Crohn's disease was detected in the colon, but the procedure did reveal several ulcers in Pledger's stomach and small intestines.

Matters came to a head in the summer of 2015, when Pledger visited Health Services more than a dozen times complaining of loss of appetite, weight loss, and severe abdominal pain. In early June, a physician on duty ordered an abdominal ultrasound to evaluate Pledger's "recurrent daily, worsening right sided abdominal pain." J.A. 438–39. Over the next several months, other providers also recommended a CT scan of Pledger's abdomen, as well as a consultation with a gastroenterologist ("GI"). Those appointments were never scheduled.

By August, Pledger's pain had worsened. He visited Health Services half a dozen times that month, complaining of "[s]tabbing" pain and a feeling that "something is going to bust open." J.A. 399, 410. During one visit, a Physician's Assistant found a "palpable & tender, firm . . . mass" in Pledger's abdomen and said she would "try to push up" his pending ultrasound and GI consultation. J.A. 560. A week later, Dr. Anderson likewise indicated that he would "inquire on priority" for an abdominal ultrasound. J.A. 411. But there is no evidence in the record that any follow-up appointments in fact were scheduled, on a priority basis or otherwise. Instead, each time Pledger went to Health Services,

5

providers recommended only "[r]est and hydration," J.A. 413, or told him to "[f]ollow-up . . . as needed," J.A. 411. On August 28, after a nurse instructed Pledger to increase his fluid and fiber intake before a "follow up scheduled . . . in the near future," he replied that he would "be dead before the tests are done." J.A. 399.

Two weeks later, on September 8, 2015, Pledger collapsed from "extreme pain." J.A. 82, 393. After he was transferred to a hospital, Pledger finally underwent a CT scan, which revealed inflammation in his abdomen necessitating surgery. That surgery revealed acute ulceration, stricture formation (abnormal narrowing), and abscesses in his colon. The surgeon removed just over a foot of Pledger's colon and small intestines, including a 4-centimeter section of obstructed colon. A hospital staff member told Pledger that had he "waited another month" for evaluation and treatment, "he would have likely died." J.A. 83.

**B.**

After the Bureau of Prisons denied his timely administrative tort claim, Pledger filed suit against the United States, several individual officers involved in his medical care, and St. Joseph's Hospital, where his May 2015 colonoscopy was performed. Proceeding pro se in the Northern District of West Virginia,[2] Pledger pled Federal Tort Claims Act ("FTCA") claims against the United States and *Bivens* claims against the individual officers and the hospital. Our focus here is on the district court's disposition of the two

---

[2] Pledger, who is now incarcerated at FCI Butner in Butner, North Carolina, originally filed suit in the Eastern District of North Carolina. That court transferred the case in October 2016.

claims that remain relevant on appeal: an FTCA claim for medical negligence against the United States, and a *Bivens* claim against three individual officers for deliberate indifference to Pledger's serious medical needs.[3]

1.

In the district court, the United States moved to dismiss Pledger's FTCA medical negligence claim. As the government noted, the FTCA effects a partial waiver of the sovereign immunity of the United States, allowing damages liability for certain acts of federal employees that violate state law. *See* 28 U.S.C. § 1346(b)(1) (allowing suit "where the United States, if a private person, would be liable . . . in accordance with the law of the place where the act or omission occurred"). Because the FTCA incorporates West Virginia liability standards into Pledger's suit, the government argued, Pledger also should be held to the pre-suit requirements of the West Virginia Medical Professional Liability Act ("MPLA"). Under the MPLA, plaintiffs bringing medical malpractice or negligence claims under West Virginia law generally must serve on each named provider, at least thirty days before filing suit, a notice of the claim, a statement of the theory of liability, a list of other providers and health care facilities also being notified, and a "screening certificate of merit" by a qualifying health care provider evaluating the claim. W. Va. Code § 55-7B-6(b).

---

[3] Pledger also brought additional FTCA and *Bivens* claims in the district court, including an FTCA claim against the United States for intentional infliction of emotional distress and *Bivens* claims against several additional federal officers since dismissed from the case. Because Pledger does not press these claims in his counseled brief in this court, we do not consider them on appeal. *Cf. United States v. Dunnican*, 961 F.3d 859, 882 (6th Cir. 2020) (explaining that Federal Rule of Appellate Procedure 31(a) generally requires litigants to "present a single brief").

Because Pledger had not done so, the government concluded, his claim should be dismissed.

The magistrate judge reviewing Pledger's complaint agreed with the United States and recommended dismissal of the FTCA claim, finding that the MPLA's certificate requirement is "mandatory prior to filing suit in federal court." *See Pledger I*, 2018 WL 5905893, at \*27 (citing *Stanley v. United States*, 321 F. Supp. 2d 805, 806–07 (N.D. W. Va. 2004)). The district court accepted this portion of the magistrate's report and recommendation, overruling Pledger's objection to application of the MPLA's certificate requirement. *See Pledger v. United States* (*Pledger II*), No. 2:16-cv-83, 2018 WL 4627023, at \*8–9 (N.D. W. Va. Sept. 27, 2018). The court did not address Pledger's contention that the MPLA's "specialized pleading[]" requirement "conflict[s]" with the Federal Rules of Civil Procedure. J.A. 112. Instead, the court focused on whether Pledger had adequate notice of the MPLA's requirements and, finding that he did, dismissed his FTCA medical negligence claim with prejudice. *See Pledger II*, 2018 WL 4627023, at \*8–9.

2.

The individual defendants, too, asked the district court to dispose of the *Bivens* claims against them, either by dismissing Pledger's complaint for failure to state a claim or, in the alternative, by granting them summary judgment. As relevant here, three individuals involved in Pledger's treatment at FCI Gilmer – Dr. Eddie Anderson, Physician Assistant Alicia Wilson, and Nurse Andrea Hall – argued that Pledger could not satisfy the subjective prong of the deliberate indifference standard, showing that they knew of but

8

disregarded an excessive risk to his health. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Instead, in their view, Pledger's complaint alleged no more than a "disagreement over the appropriate course of treatment" – an allegation that falls short, as a matter of law, of deliberate indifference under the Eighth Amendment. J.A. 148; *see, e.g.*, *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). In support of their request, the defendants submitted a declaration from Dr. Anderson detailing Pledger's care and more than 600 pages of Pledger's medical records.

Because Pledger was proceeding pro se – that is, without the assistance of counsel – the magistrate judge sent him a special notice of the defendants' dispositive motion, under the practice set out in *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam). Under *Roseboro*, as we have explained, before summary judgment may be granted against a pro se party for failure to substantiate his claims, he must be given notice of his right to file counter-affidavits and other relevant materials and informed that his failure to do so might result in dismissal of his case. *See Carter v. Hutto*, 781 F.2d 1028, 1033 (4th Cir. 1986). Here, the *Roseboro* notice informed Pledger that he must respond with "any opposition he has to the [*Bivens*] Defendants' motion, explaining why his case should not be dismissed." J.A. 818. It did not, however, mention his right to file counter-affidavits or seek other material to support his claim.

In response to the notice, Pledger reiterated his prior request for appointment of counsel, which he had argued was necessary given the "complex" issues in the case and the need for "significant research and investigation." J.A. 106. The magistrate judge again denied the request, on the ground that Pledger had "failed to show a particular need or

9

exceptional circumstances that would require the assistance of a trained practitioner." J.A. 824. Still proceeding pro se, Pledger then opposed the *Bivens* defendants' motion, arguing first that summary judgment was inappropriate at this stage because "[d]iscovery ha[d] not been allowed." J.A. 830. He also contended that even the current and limited record would fairly support his claim of deliberate indifference, precluding an award of summary judgment to the defendants.

Here, the magistrate judge agreed with Pledger, recommending against granting the defendants' motion because, viewed in the light most favorable to Pledger, the record would allow a reasonable jury to find that the defendants "were aware of Pledger's pain and symptoms of Crohn's but unreasonably delayed or withheld treatment anyway," thus satisfying the deliberate indifference standard. *Pledger I*, 2018 WL 5905893, at *40. This time, the district court disagreed, rejecting this part of the magistrate's report and recommendation and entering judgment in favor of the *Bivens* defendants. *Pledger II*, 2018 WL 4627023, at *5–8. As the district court read the record, Pledger had received "continuous medical care," with providers attempting to "alleviate [his] problems" through "numerous different treatments." *Id.* at *6. It followed, the court reasoned, that Pledger had alleged at most mistakes in the provision of medical treatment, which might amount to "malpractice or negligence" but could not satisfy the more demanding deliberate indifference standard. *Id.*[4]

---

[4] The district court also adopted the magistrate judge's recommendation to dismiss Pledger's *Bivens* claim against St. Joseph's Hospital, arising from his May 2015 colonoscopy and gastroscopy, on the ground that *Bivens* allows suits only against

10

Pledger timely appealed and filed an informal opening brief. We appointed counsel and requested briefing on whether the district court erred in applying West Virginia's certificate of merit requirement to Pledger's federal-court FTCA claim or in its assessment of Pledger's *Bivens* claims for deliberate indifference.

## II.

We turn first to the district court's dismissal of Pledger's FTCA claim for medical negligence. Because the court resolved this claim on a motion to dismiss, our review is de novo. *See Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021).

The district court concluded that Pledger's FTCA claim against the United States – premised, as per the FTCA, on a violation of West Virginia medical negligence law, *see* 28 U.S.C. § 1346(b)(1) (applying "law of the place where the act or omission occurred" to determine liability) – was subject to West Virginia's pre-suit notice and certification requirement for medical negligence cases. *See* W. Va. Code § 55-7B-6 (2003).[5] Under

_____

individual federal officers and not against entities like hospitals. *See Pledger II*, 2018 WL 4627023, at *10; *Pledger I*, 2018 WL 5905893, at *31–32; *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). On appeal, Pledger does not challenge this holding. The parties suggest, however, that Pledger may have alleged a separate medical negligence claim – distinct from any *Bivens* Eighth Amendment claim – against the hospital. It is not clear to us that Pledger has pleaded such a claim, but we leave any question here for the district court to resolve on remand.

[5] The West Virginia Legislature has amended § 55-7B-6 twice since Pledger filed suit. *See State ex rel. PrimeCare Med. of W. Va., Inc. v. Faircloth*, 835 S.E.2d 579, 584 n.4 (W. Va. 2019). We refer to the version of § 55-7B-6 in effect at the time Pledger filed suit in September 2016, although we note that none of the subsequent amendments made substantive changes that would alter our analysis.

West Virginia's MPLA, would-be medical malpractice plaintiffs must serve on each putative defendant, at least thirty days prior to filing suit, a notice of claim that includes a "screening certificate of merit" from a health care provider who qualifies as an expert under state law. *See id.* § 55-7B-6(a)–(b). And in that certificate, the expert must set out and explain her judgment that the "applicable standard of care was breached" in a way that "resulted in injury or death." *Id.* § 55-7B-6(b). In order to file and maintain a suit, in other words, plaintiffs raising medical liability claims under West Virginia law must first obtain and present expert support for their claims.

West Virginia is not alone in imposing such a pre-suit certification requirement. About half of all states similarly demand that medical malpractice plaintiffs secure some sort of early support from a qualifying expert. *See* Benjamin Grossberg, Comment, *Uniformity, Federalism, and Tort Reform: The* Erie *Implications of Medical Malpractice Certificate of Merit Statutes*, 159 U. Pa. L. Rev. 217, 225 (2010). Predictably, questions have arisen as to whether and to what extent those state-law requirements apply to actions brought in federal court. *See Jones v. Corr. Med. Servs., Inc.*, 845 F. Supp. 2d 824, 854 & n.11 (W.D. Mich. 2012) (gathering cases and discussing split in authority); *Shields v. United States*, 436 F. Supp. 3d 540, 549–50 (D. Conn. 2020) (same). But there is now a growing consensus that certificate requirements like West Virginia's do not govern actions in federal court, because they conflict with and are thus supplanted by the Federal Rules of Civil Procedure. *See Gallivan v. United States*, 943 F.3d 291, 294 (6th Cir. 2019); *Young v. United States*, 942 F.3d 349, 351 (7th Cir. 2019). We agree, and hold that failure to

12

comply with West Virginia's MPLA is not grounds for dismissal of Pledger's federal-court FTCA action.

**A.**

We begin with the fundamental and uncontroversial point that the Federal Rules of Civil Procedure generally govern all civil actions in federal court. *See* Fed. R. Civ. P. 1. Because Pledger has brought an FTCA claim in federal court, the Federal Rules apply. Indeed, the originally enacted version of the FTCA expressly instructed courts to apply the Federal Rules, and later versions omitted that clarification only because Congress deemed it "unnecessary." *United States v. Yellow Cab Co.*, 340 U.S. 543, 553 n.9 (1951); *see Gallivan*, 943 F.3d at 294.

But that is not the end of the matter, because we have here another rule – West Virginia's MPLA – that also, by its terms, would appear to apply to Pledger's medical liability claim. Fortunately, the Supreme Court has provided us with a well-established, two-step framework for mediating any potential conflict. *See Hanna v. Plumer*, 380 U.S. 460 (1965); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010). We first ask whether the Federal Rules "answer[] the question in dispute," *Shady Grove*, 559 U.S. at 398 – here, whether a medical malpractice plaintiff must provide pre-suit expert support for his claim. If the Federal Rules do answer that question, then they govern, notwithstanding West Virginia's law – unless, at step two of the analysis, we find the relevant Federal Rules invalid under the Constitution or the Rules Enabling Act. *Id.* at 398; *see also Hanna*, 380 U.S. at 471. But if there is a valid Federal Rule that answers the "same question" as the MPLA, then our work is done, and we apply the Federal Rules

13

without wading into the "murky waters" of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), and its distinct choice-of-law rules. *Shady Grove*, 559 U.S. at 398–99.

In recent years, several federal courts have applied this *Shady Grove* framework and held that the Federal Rules displace state certificate requirements like West Virginia's. *See, e.g.*, *Gallivan*, 943 F.3d at 293–94; *Young*, 942 F.3d at 351; *Andes v. United States*, No. 1:19CV00005, 2020 WL 3895780, at *4–5 (W.D. Va. July 10, 2020). Following their guidance, we conclude that the Federal Rules governing the sufficiency of pleadings likewise answer the "question in dispute" here, and thus supplant West Virginia's certificate requirement in this federal-court FTCA action.

### 1.

We first consider whether the Federal Rules of Civil Procedure answer the same question as the MPLA: "[D]oes someone need a[] [certificate] of merit to state a claim for medical negligence?" *Gallivan*, 943 F.3d at 293. For these purposes, the Federal Rules may "answer" a question without speaking to it expressly; if the scope of a Rule (or Rules) is "sufficiently broad" either to "cause a direct collision" with West Virginia's MPLA or "implicitly, to control the issue," then the Federal Rules govern notwithstanding state law. *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4–5 (1987) (internal quotation marks omitted); *see also Shady Grove*, 559 U.S. at 399 (finding that Federal Rule providing "one-size-fits-all formula" displaces more specific state rule addressing same question). Here, we conclude that the Federal Rules indeed "answer[] the question in dispute," *Shady Grove*, 559 U.S. at 398, and that several of them provide an answer different than West Virginia's.

14

We begin with the pleading standards for complaints in federal court. Rule 8 of the Federal Rules of Civil Procedure requires only a "short and plain statement" of a plaintiff's claim, in a deliberate departure from the more detailed pleading requirements of the past. Fed. R. Civ. P. 8(a)(2); *see Shields*, 436 F. Supp. 3d at 548. With that description of his claim, a plaintiff also must provide a jurisdictional statement and an explanation of the relief sought, *see* Fed. R. Civ. P. 8(a)(1), (3) – a list of elements that "implicitly excludes other requirements." *Gallivan*, 943 F.3d at 293 (internal quotation marks omitted). The MPLA, by contrast, requires more: that a plaintiff not only provide a "short and plain statement" of his claim in order to file suit, but also serve a certificate attesting to the merit of that claim – or, if he believes his claim falls into a limited statutory exception to the certificate requirement, serve and file "a statement specifically setting forth the basis of the alleged liability of the health care provider." W. Va. Code § 55-7B-6(c) (2003); *see State ex rel. Hope Clinic, PLLC v. McGraw*, 858 S.E.2d 221, 228 (W. Va. 2021).

Rule 9 only "confirms" this contrast between the MPLA and the Federal Rules' baseline pleading standard "by specifying the few situations when heightened pleading *is* required" in federal court. *Gallivan*, 943 F.3d at 293. Under Rule 9, only those alleging fraud or mistake must "state with particularity the circumstances" giving rise to their claims. Fed. R. Civ. P. 9(b). The MPLA governs claims that do not relate to fraud or mistake, yet still "impose[s] a heightened pleading standard." *Gallivan*, 943 F.3d at 293. Applying it in federal court, then, "would upset the careful balance struck by the Federal Rules." *Id.* at 293–94.

Rule 12 is likewise "sufficiently broad" to control a question that the MPLA, too, seeks to answer: what defects in a complaint mandate dismissal. *See Burlington N. R.R. Co.*, 480 U.S. at 4–5 (internal quotation marks omitted). Under Rule 12, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs need not gather any expert evidence or serve it on defendants "for a claim to be plausible." *Gallivan*, 943 F.3d at 293. The MPLA's certificate requirement thus represents an additional hurdle for plaintiffs. In fact, in West Virginia state court, failure to comply with the MPLA's pre-suit procedures – in whole or in part – is grounds for dismissal under the state's equivalent of Rule 12. *See Hinchman v. Gillette*, 618 S.E.2d 387, 395 (W. Va. 2005) (holding that medical providers can object to sufficiency of notice and certificate, and seek dismissal on that basis if plaintiff fails to cure); *State ex rel. PrimeCare Med. of W. Va., Inc. v. Faircloth*, 835 S.E.2d 579, 589 (W. Va. 2019) (holding that failure to send notice and certificate mandates dismissal on jurisdictional grounds).

Finally, we agree with Pledger that West Virginia's MPLA is inconsistent with Rule 11, which addresses frivolous filings. *See* Fed. R. Civ. P. 11(a)–(d). As the United States itself acknowledges, the MPLA's certificate requirement addresses the same issue, and likewise seeks to limit frivolous malpractice suits. But it does so through a mechanism – an early affidavit from an expert – that Rule 11 specifically disclaims: Rule 11 expressly provides that "a pleading need *not* be verified or accompanied by an affidavit," and instead

16

treats the signature of an attorney or party as a certification that the claim is legally sufficient and likely factually supported. Fed. R. Civ. P. 11(a), (b) (emphasis added).

In short, like courts before us, we find that it is "impossible to reconcile" certificate requirements like West Virginia's with the "requirements of the Federal Rules of Civil Procedure." *Shields*, 436 F. Supp. 3d at 548. And contrary to the suggestion of the United States, it is no answer that it would be possible for a claimant to "comply with both" the Federal Rules and West Virginia law, satisfying the more generous standards of the Federal Rules and then adding something extra for the MPLA. Under *Shady Grove*, what matters is whether the "one-size-fits-all formula" for filing and maintaining a complaint set out by the Federal Rules is enough to "provide[] an answer" to the question at issue: whether a plaintiff must obtain an expert certificate of merit before he may file and maintain a medical malpractice suit. *See* 559 U.S. at 398–99. Because the Federal Rules answer that question in the negative, West Virginia's MPLA cannot apply to Pledger's federal-court action under step one of the *Shady Grove* framework. *Id.*

2.

That leaves the step-two question: whether the MPLA nevertheless governs this case because the relevant Federal Rules are "ultra vires" – that is, outside Congress's constitutional rulemaking power or the statutory authorization provided by the Rules Enabling Act. *Id.*; *see Hanna*, 380 U.S. at 471. We may dispense briefly with this part of the analysis. The United States has not disputed the validity of the Federal Rules in question, either as a general matter or as applied here, and with good reason. The Federal Rules of Civil Procedure enjoy "presumptive validity under both the constitutional and

17

statutory constraints," *Burlington N. R.R. Co.*, 480 U.S. at 6, and the Supreme Court has "[s]o far . . . rejected every challenge to the Federal Rules that it has considered under the Rules Enabling Act," *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1336 (D.C. Cir. 2015). Like other courts to consider the question, we see "no reason to doubt the validity of the Federal Rules at issue here." *Gallivan*, 943 F.3d at 294; *see also Shields*, 436 F. Supp. 3d at 548 n.6. It follows that the Federal Rules, not the MPLA, govern Pledger's claim in federal court, and that the district court erred by applying West Virginia's certificate requirement.

### B.

The United States addresses none of this straightforward analysis in its brief on appeal. It does not discuss the *Shady Grove* framework nor even refer to *Shady Grove*, notwithstanding that case's centrality to Pledger's arguments and to the other circuits that have considered similar state certificate requirements. As a result, it has no occasion to argue the finer points of whether West Virginia's MPLA and the Federal Rules of Civil Procedure answer the "same question" under *Shady Grove*.

Instead, the United States appears to apply the choice-of-law framework set out in *Erie*, arguing that the MPLA should govern because it is "substantive," in that "the nature of litigation would be drastically different if prospective plaintiffs had to produce a certificate of merit before they could file a lawsuit in state court but not in federal court." Appellees' Br. 8–9. But that misunderstands the order of operations here. Whether a state law is "technically one of substance or procedure" and "whether it 'significantly affect[s] the result of a litigation'" are questions we ask when evaluating "the constitutional power

18

of federal courts to supplant state law with *judge-made* rules" under *Erie*. *Shady Grove*, 559 U.S. at 406 (Scalia, J.) (plurality opinion) (quoting *Guaranty Trust Co. v. York*, 326 U.S. 99, 109 (1945)) (emphasis added). But as we have explained, if a valid *Federal Rule* answers the question at issue, then the "relatively unguided" *Erie* analysis is beside the point, *Hanna*, 380 U.S. at 471; the Federal Rule governs, without more. *See Shady Grove*, 559 U.S. at 398. Only if we first find, that is, that the Federal Rules are either "inapplicable or invalid" will we go on to explore the nuances of *Erie*. *Id.*; *see also Gallivan*, 943 F.3d at 295 ("[T]he government's argument that [the state certificate requirement] is substantive under *Erie* makes no difference.").

At oral argument, however, the government focused for the first time on *Shady Grove*, suggesting that the MPLA – unlike the certificate requirements reviewed by the cases we discuss above – does not in fact "answer a question" already addressed by the Federal Rules. That is because, the government urges, the MPLA's certificate must be served *before* filing suit, rather than included *with* a court filing, and so does not set a pleading standard or even speak to court procedures at all. *Compare* W. Va. Code § 55-7B-6(b) (2003) (requiring that claimant send certificate to defendants), *with Gallivan*, 943 F.3d at 293 (addressing Ohio rule requiring filing of affidavit), *and Young*, 942 F.3d at 351 (evaluating Illinois law requiring attachment of certificate to complaint). We disagree.

The Supreme Court rejected precisely this kind of hair-splitting in *Shady Grove*. The Court already had made clear that the step-one inquiry is a functional one, asking whether the scope of the Federal Rules, fairly construed, is broad enough either to "implicitly . . . control" the same issue addressed by state law or to cause a direct conflict

19

with that law. *See Burlington N. R.R. Co.*, 480 U.S. at 4–5 (internal quotation marks omitted). In *Shady Grove*, the Court considered whether Federal Rule 23's "one-size-fits-all" criteria for the maintenance of class actions left room for the operation of a state law that would impose additional requirements. *See* 559 U.S. at 398–99. And it had no difficulty rejecting the state's proposed distinction between its rule, which purportedly addressed the "antecedent question" of class-action *eligibility*, and Rule 23, which the state viewed as addressing only class-action *certification*: "[T]he line between eligibility and certifiability is entirely artificial." *Id.* at 399. So too, here. The line between requiring attachment of a certificate to a complaint and service of a certificate on a defendant is equally artificial; either way, West Virginia's certificate requirement amounts to a "precondition[] for maintaining" a medical malpractice suit. *Id.*

Moreover, even if we were to credit the formalistic line drawn by the government and treat the MPLA solely as a rule of service, we would end up in the same place. A service rule might be seen as addressing a different question, for *Shady Grove* purposes, than Federal Rule 8, which governs only the complaint that must be filed with a court. But there remains Federal Rule 12 – which lays out the grounds on which a suit may be dismissed – and that rule's conflict with the MPLA, which adds an additional ground for dismissal. *See PrimeCare*, 835 S.E.2d at 589 (failure to serve certificate on defendant is grounds for dismissal of complaint). And to the extent the MPLA is viewed as a service rule, it generates yet another conflict – "this time with Rule 4, which provides in detail the means by which one may effectuate service for cases in federal court." *Shields*, 436 F. Supp. 3d at 549 (rejecting similar argument that state certificate requirement is "not really

20

a pleading rule so much as it is a rule about service of process"); *see* Fed. R. Civ. P. 4. For this reason, as well, we remain convinced that the Federal Rules answer the same question as the MPLA, and thus displace that state-law provision in Pledger's federal-court action.

The United States also makes what we understand to be an alternative argument: Even if the Federal Rules of Civil Procedure generally would supplant the MPLA in federal court under *Shady Grove*, the government contends, the result is different here because Pledger is suing under the FTCA and the FTCA *itself* incorporates state certificate requirements like West Virginia's. Like other courts to consider this issue, *see Gallivan*, 943 F.3d at 294–95; *Shields*, 436 F. Supp. 3d at 545–47, we again disagree.

It is true, as noted above, that the FTCA permits the United States to be held liable in tort only to the extent that a private party defendant would be liable under state law. *See* 28 U.S.C. § 1346(b)(1); *Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001). But the Supreme Court consistently has held that the relevant statutory text – waiving immunity in certain circumstances where a private person "would be liable" under the "law of the place" where an act or omission occurred – incorporates state-law rules of "substantive liability," not procedure. *See FDIC v. Meyer*, 510 U.S. 471, 478 (1994) (describing consistent caselaw holding that statutory "reference to the 'law of the place' means law of the State – the source of substantive liability under the FTCA"); *see also United States v. Kwai Fun Wong*, 575 U.S. 402, 419 (2015) ("[W]hen defining substantive liability for torts, the [FTCA] reiterates that the United States is accountable 'in the same manner and to the same extent as a private individual.'" (quoting 28 U.S.C. § 2674)). This makes sense, of course, given where we started: The FTCA as originally enacted expressly provided that

21

the Federal Rules of Civil Procedure, not state procedural rules, would apply to FTCA cases. *See Yellow Cab Co.*, 340 U.S. at 553 n.9. In short, it is clear that "although substantive state law governs the *merits* of a[n] FTCA claim, the Federal Rules govern *procedural* issues." *Gallivan*, 943 F.3d at 294.

It is equally clear, we think, that the MPLA qualifies as "procedural" for these purposes, so that it is not incorporated by the FTCA's reference to state-law liability standards. West Virginia's certificate requirement appears in a statutory section governing "prerequisites" and "procedures" for filing suit, not the section outlining the elements of proof for a claim. *Compare* W. Va. Code § 55-7B-6 (2003), *with id.* § 55-7B-3; *see Shields*, 436 F. Supp. 3d at 546 (finding "suggestive[]" the placement of state certificate rule in statutory section covering "Court Practice and Procedure"). More fundamentally, West Virginia law specifically precludes the use of certificates at trial, so that they play no role in the actual adjudication of medical malpractice claims. W. Va. Code § 55-7B-6(i) (2003); *see Shields*, 436 F. Supp. 3d at 546–47. And while the United States insists that the MPLA must be treated as "substantive" under the FTCA because failure to apply it will expose the government to greater liability than similarly situated state defendants, that argument only begs the question: As we see it, failing to apply the MPLA in FTCA cases may mean that fewer complaints are dismissed as "procedurally defective," but it will do "nothing to change the scope of the government's *liability*" because state law continues to supply the "rules of decision." *Gallivan*, 943 F.3d at 295.

Finally, to the extent the United States suggests that Fourth Circuit precedent requires a ruling in its favor, we are unpersuaded. In *Davison v. Sinai Hosp. of Balt., Inc.*,

617 F.2d 361, 362 (4th Cir. 1980) (per curiam), we affirmed the application of a Maryland pre-dispute arbitration requirement in federal court. But we did so without discussion, simply adopting a district court ruling that had analyzed the question under the "outcome determinative test" of *Erie* instead of considering whether a Federal Rule of Civil Procedure controlled under *Hanna*. *See Davison v. Sinai Hosp. of Balt., Inc.*, 462 F. Supp. 778, 780 (D. Md. 1978). We need not decide here whether, evaluated under *Hanna* and *Shady Grove*, the arbitration statute at issue in *Davison* would apply in federal court. Rather, we note only that we find the district court's reasoning in that case unconvincing, as it predates *Shady Grove* and offers no "satisfactory response to the clear conflict between the federal pleading rules" and state law under that standard. *Gallivan*, 943 F.3d at 296–97 (rejecting defendant's reliance on past cases that did not engage in the *Shady Grove* analysis).

\* \* \*

In sum, we hold that the MPLA's pre-dispute certificate requirement, W. Va. Code § 55-7B-6, is displaced by the Federal Rules under *Shady Grove*, and therefore does not apply to Pledger's federal-court FTCA claim. Because the district court dismissed that claim on the erroneous assumption that the state statutory requirement applied, we reverse that dismissal and remand the claim for further proceedings consistent with this opinion.

## III.

We turn next to the district court's grant of summary judgment to three individual *Bivens* defendants on Pledger's deliberate indifference claim. We generally review a grant

23

of summary judgment de novo, viewing "the facts and inferences reasonably drawn therefrom in the light most favorable to the nonmoving party." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (internal quotation marks omitted). "[T]he relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (internal quotation marks omitted). But when a district court – as here – grants summary judgment without discovery, we review that procedural decision for abuse of discretion. *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002).

Before turning to the district court's decision to grant summary judgment in the posture presented here, we briefly describe Pledger's claims and the arguments of the parties. Pledger alleges that the three *Bivens* defendants, all of whom had some involvement in his medical care, were deliberately indifferent to his serious medical needs, violating the Eighth Amendment's ban on cruel and unusual punishment. *See Farmer*, 511 U.S. at 835; *Gordon*, 937 F.3d at 356. To prevail, Pledger must prove both an objective and subjective component. *Gordon*, 937 F.3d at 356. The objective component – satisfied by a showing that a plaintiff has a "serious medical condition," *id.* – is not at issue here; the defendants concede that Pledger's Crohn's disease qualifies. What is at issue is the subjective prong, under which Pledger must show "deliberate indifference" to his serious medical needs – that the defendants "had actual knowledge of [his] serious medical needs

24

and the related risks, but nevertheless disregarded them." *Id.* at 357 (internal quotation marks omitted).

The defendants maintain, and the district court agreed, that Pledger's complaints amount to no more than a dispute over the proper course of treatment, insufficient to show deliberate indifference. *See Jackson*, 775 F.3d at 178. For support, they point to undisputed record evidence – hundreds of pages of Pledger's medical records from FCI Gilmer – establishing that Pledger was seen multiple times by health providers who prescribed medication, monitored his symptoms, and otherwise attempted to treat his disease. That "continuous medical care," *Pledger II*, 2018 WL 4627023, at *6, the district court concluded, was fundamentally inconsistent with a showing that the defendants knowingly "disregard[ed] an excessive risk to inmate health or safety," *id.* at *5 (quoting *Farmer*, 511 U.S. at 837).

Pledger, of course, sees it differently. That he received some medical treatment, he urges, does not necessarily preclude a finding of deliberate indifference if his doctors nevertheless "ignored and failed to treat many of his symptoms." *See Jehovah v. Clarke*, 798 F.3d 169, 181 (4th Cir. 2015). Pledger points to record evidence showing that his providers themselves *agreed* that certain tests and consultations were necessary but failed to provide them until it was too late – circumstances that we have held may support a deliberate indifference claim. *See Jackson*, 775 F.3d at 179 (holding that plaintiff states claim for deliberate indifference by alleging that prison doctor failed to provide the very "testing and treatment . . . that [the doctor] thought appropriate"). And while the defendants

25

advanced at oral argument some possible justifications for the failure to follow through on Pledger's recommended treatment, the record as it now stands provides no explanation.

Given these arguments, Pledger argues that the current record presents "sufficient disagreement," in the form of disputes of fact material to the deliberate indifference standard, to preclude judgment as a matter of law and require submission to a jury. *See Gordon*, 937 F.3d at 356 (internal quotation marks omitted). We need not resolve that issue, because we agree with Pledger's alternative argument: that the district court erred procedurally when it granted summary judgment without first providing Pledger with the required notice or an opportunity to engage in discovery. For that reason, we vacate the district court's award of summary judgment and remand for further proceedings on Pledger's claims against the *Bivens* defendants.

For nearly fifty years, our decision in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) (per curiam), has required that district courts, before awarding summary judgment to a defendant, notify a pro se plaintiff like Pledger of his obligations at the summary judgment stage and his right to file counter-affidavits or other responsive material. *See Roseboro*, 528 F.2d at 310; *Carter*, 781 F.2d at 1033 (explaining *Roseboro* obligation). Here, after the defendants filed their motion to dismiss or, in the alternative, for summary judgment, the magistrate judge did issue a *Roseboro* notice. But that notice fell short of *Roseboro*'s requirements. To be sure, it informed Pledger that that motion might be treated as one for summary judgment – outlining the summary judgment standard as well as the dismissal standard – and advised that Pledger "must set forth specific facts showing that there is a genuine issue for trial" to survive a motion for summary judgment under Rule 56

26

of the Federal Rules of Civil Procedure. J.A. 817–18 (quoting Fed. R. Civ. P. 56(e)). But critically, it did not inform Pledger that he could submit affidavits or other material to counter the defendants' motion for summary judgment. *See Roseboro*, 528 F.2d at 310 (reversing award of summary judgment where pro se plaintiff was not "advised of his right to file counter-affidavits or other responsive material and alerted to the fact that his failure to so respond might result in the entry of summary judgment against him"). When a litigant is proceeding pro se, like Pledger, it is "particularly important that [he] either have notice and a chance to file appropriate supplementary materials . . . or at least have had a full opportunity to present all the matter the district court would have needed to render summary judgment." *Dolgaleva v. Va. Beach City Pub. Schs.*, 364 F. App'x 820, 825 (4th Cir. 2010).

Here, Pledger was neither notified of his right to file additional material in opposition to the defendant's motion nor given an opportunity to obtain such material through discovery. Instead, Pledger's *Roseboro* notice implied that additional materials were unnecessary: In instructing Pledger to file an opposition "explaining why his case should not be dismissed," J.A. 818, the notice suggested that an explanation by itself would be sufficient, when in fact Pledger would have to do more – submit an affidavit and other evidence – to defeat a summary judgment motion. And while the magistrate judge was prepared to treat the sworn allegations in Pledger's *Bivens* complaint as the equivalent of an affidavit for summary judgment purposes, we cannot know what additional information Pledger could have added to bolster his allegations by way of affidavit had he been advised of his right to file one, nor what other material might have been available to him by way of

27

discovery. As the magistrate judge observed, the record as it stands, though extensive, does not include all of Pledger's medical records, and additional information could "clarify how much the [*Bivens* defendants] actually knew" about Pledger's medical condition when they treated him – a question with direct bearing on the deliberate indifference inquiry. *Pledger I*, 2018 WL 5905893, at \*40; *see Jackson*, 775 F.3d at 178 (explaining importance to deliberate indifference analysis of a defendant's "actual subjective knowledge" of an inmate's "serious medical condition" and attendant risks).

Indeed, the grant of summary judgment on this incomplete record deprived Pledger not only of adequate *Roseboro* notice but also of Rule 56(d)'s protections. Under Rule 56(d), a litigant opposing summary judgment may request time for discovery – or deferral or denial of summary judgment altogether – when he "cannot present facts essential to justify [his] opposition." *See* Fed. R. Civ. P. 56(d). As we have explained, relief under Rule 56(d) is "broadly favored and should be liberally granted in order to protect non-moving parties from premature summary judgment motions," *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 484 (4th Cir. 2014) (internal quotation marks omitted), consistent with the general rule that summary judgment should only be granted "after adequate time for discovery," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). And as Pledger points out, "[s]ufficient time for discovery is considered especially important when the relevant facts" – here, facts bearing on the subjective knowledge of the *Bivens* defendants – are "exclusively in the control of the opposing party." *See Harrods*, 302 F.3d at 246–47 (internal quotation marks omitted); *see also id.* ("[S]ummary judgment prior to discovery

28

can be particularly inappropriate when a case involves complex factual questions about intent and motive.").

It is true that Pledger, never informed of his right to seek discovery under Rule 56(d), never formally did so. But Pledger did, four times, seek appointment of counsel, based in part on the need for "investigation." J.A. 106. And in his objections to the magistrate judge's report and recommendation, Pledger specifically raised the fact that "[d]iscovery has not been allowed." J.A. 830. Even in counseled cases, we have excused technical noncompliance with Rule 56(d) where the nonmoving party is not at fault and "has adequately informed the district court that the motion is premature and that more discovery is necessary." *Harrods*, 302 F.3d at 244. Here, Pledger, a prison inmate precluded by local rules from taking discovery without court permission, *see* N.D. W. Va. Local R. Prisoner Litig. P. 7 (Mar. 2018), cannot be faulted for failing already to have gathered necessary evidence. And given Pledger's pro se status and our obligation to liberally construe pro se pleadings, *see DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018), we conclude that Pledger put the district court on fair notice of a potential dispute as to the sufficiency of the summary judgment record, *see Harrods*, 302 F.3d at 244–45 (holding that district court erred in granting summary judgment without discovery where the "nonmoving party's objections before the district court served as the functional equivalent of an affidavit" under Rule 56(d) and "the nonmoving party was not lax in pursuing discovery").

Given the shortcomings in Pledger's *Roseboro* notice and the failure to provide him with an opportunity for discovery, the district court abused its discretion in granting

29

summary judgment in this posture. *See Harrods*, 302 F.3d at 244, 247 (reversing as premature grant of summary judgment under abuse of discretion standard). Accordingly, we vacate the award of summary judgment to the defendants on Pledger's deliberate indifference claims and remand for further proceedings consistent with this opinion.[6]

## IV.

For the foregoing reasons, we reverse the district court's dismissal of Pledger's FTCA medical negligence claim, vacate the grant of summary judgment on his *Bivens* claim for deliberate indifference, and remand for further proceedings consistent with this opinion.

*REVERSED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

---

[6] Pledger's repeated requests for counsel in the district court have thus far been denied. Because we believe further factual development would be appropriate, the district court may wish to consider appointing counsel to assist in litigating the case on remand, consistent with local rules and procedures. *See Brooks v. Johnson*, 924 F.3d 104, 122 n.9 (4th Cir. 2019).

QUATTLEBAUM, Circuit Judge, concurring in part[1] and dissenting in part:

The West Virginia certificate of merit portion of this appeal involves the interplay of federal and state law, the *Erie*[2] doctrine and whether laws are substantive or procedural. Admittedly, discussion of these issues may conjure up nightmares from law school. And if not that, it most certainly will cause a reader's eyes to glaze over. Any way you slice it, this is wonky stuff. But as esoteric as these concepts can be, underneath them are important principles of federalism. What is the proper balance of power between the federal government and the states? How do the Supremacy Clause and the Tenth Amendment interact? The gravity of these concepts should wake us from our *Erie*-induced slumber.[3]

The interplay of laws here arises in the context of the Federal Tort Claims Act ("FTCA"), which directs federal courts, the exclusive forum for such an action, to look to state substantive law to determine liability. *See* 28 U.S.C. § 1346(b)(1). To begin, the FTCA is a statutory waiver of sovereign immunity which "confers federal-court

---

[1] I concur in the majority's decision concerning Pledger's *Bivens* claim.

[2] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.").

[3] Over thirty years ago, I was awakened from such a slumber by Howard B. Stravitz, my Civil Procedure professor. To say that Professor Stravitz was "one of a kind" is an understatement. Barely over five feet tall, impeccably dressed, a connoisseur of fine food and wine, a Brooklyn accent teaching in the deep South, Professor Stravitz taught with passion and humor for over 40 years. He loved the law, his students, his colleagues, his friends and his family. He was deeply religious. And his wonderful personality influenced countless law students for over four decades, including me. Professor Stravitz died April 30, 2021, after a battle with cancer. He will be missed. Even so, I cannot help but think he would enjoy the debate about the issues we face today. Hopefully, he would have joined in the dissent.

jurisdiction in a defined category of cases involving negligence committed by federal employees in the course of their employment." *Dolan v. United States Postal Serv.*, 546 U.S. 481, 484 (2006). Liability under the FTCA flows "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). This liability lies "in the same manner and to the same extent as a private individual." 28 U.S.C. § 2674. And the Supreme Court has instructed us that in § 1346(b)(1), "the 'law of the place' means law of the State—the source of substantive liability under the FTCA." *F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994). Put simply, under the FTCA, the federal government is liable here to the same extent a private party would be in the state of West Virginia.[4]

Pledger brought an FTCA suit alleging violations of the West Virginia medical professional liability statute. West Virginia, in establishing its contours of medical professional liability, passed a comprehensive statutory scheme. W. Va. Code § 55-7B (the "MPLA"). The MPLA seeks to balance two competing interests—"the increase in the cost of liability insurance and . . . [the] access to affordable health care services for [its] citizens." *Id*. § 55-7B-1. In furtherance of those interests, before a plaintiff can bring a medical malpractice action, he or she must serve a defendant with a certificate of merit. *See id*. § 55-7B-6(b). There are several requirements for the certificate of merit. It must be completed by a healthcare provider. *Id*. It must also outline the provider's qualifications, the provider's familiarity with the requisite standard of care and the provider's opinions as

---

[4] As the alleged wrongful acts and/or omissions occurred in West Virginia, the FTCA directs us to apply West Virginia law.

to both how the standard of care was breached and causation. *Id*. Finally, the certificate must identify the medical records the provider reviewed in executing the certificate of merit. *Id*. Importantly, failure to comply with this requirement is fatal. If the certificate is not completed and served, a West Virginia medical malpractice claim cannot go forward. *Id*. § 55-7B-6(a) ("[N]o person may file a medical professional liability action against any health care provider without complying with the provisions of this section.").

Before filing his FTCA suit, Pledger did not serve a certificate of merit. Subsequent to filing suit, the district court granted him a sixty-day extension to comply with the requirement. Pledger still did not serve a certificate of merit. As a result, the district court then dismissed his suit for failure to comply with the requirement. But the majority now says the district court got it wrong because the Supreme Court's *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010) decision dictates that he did not have to serve a certificate of merit. By the majority's view, while a West Virginia medical malpractice suit can be properly dismissed in state court for failure to serve a certificate of merit, when brought under the FTCA in federal court, that requirement vanishes. The result—a requirement imposed by a separate sovereign in its effort to fashion a state cause of action that strikes the right balance between insurance costs and affordable healthcare is ignored.

I see the West Virginia certificate of merit requirement quite differently than the majority. For one, under a *Shady Grove* analysis, the Federal Rules do not answer, as that case requires, the question of whether a West Virginia medical malpractice plaintiff must serve a certificate of merit prior to filing his FTCA suit. In my view, the majority stretches

33

*Shady Grove* past its intended context in a way that unnecessarily impairs the ability of a state to perform a function the Tenth Amendment guarantees—implement requirements for state-law causes of action.

Because *Shady Grove* does not resolve our question, Supreme Court precedent, while not addressing an FTCA suit, would then suggest we proceed with an *Erie* analysis. *See Shady Grove*, 559 U.S. at 398. But that analysis is tricky because the considerations that bear on the line between substantive and procedural identified by the Supreme Court in its decisions following *Erie* are not helpful in an FTCA suit. After all, we are not looking to West Virginia law under diversity of citizenship jurisdiction, unlike *Erie* and its progeny. By contrast, here we have jurisdiction based on 28 U.S.C. § 1346(b)(1). And that federal jurisdiction is exclusive, meaning there is no choice between federal and state court. Even so, an evaluation of the certificate of merit requirement reveals that it is, in fact, substantive because substantive liability would not flow under West Virginia law because Pledger failed to comply with the certificate of merit requirement.

For those reasons and as more fully explained below, I would affirm the dismissal of Pledger's FTCA suit.

34

## I.

According to the majority, the West Virginia certificate of merit requirement analyzed under *Shady Grove* is an easy inquiry. *See* Maj. Op. at 13–14. I respectfully disagree. *Shady Grove* merely starts us down a thorny path.[5]

To begin, let's review *Shady Grove*. There, the Supreme Court considered whether a state law could, in effect, provide for limitations in addition to the requirements for maintaining a class action laid out under Federal Rule of Civil Procedure 23. *See Shady Grove*, 559 U.S. at 396. Justice Scalia wrote for a plurality of the Court that, where a Federal Rule and state law conflict, we ask two questions. First, does a Federal Rule answer the question? *Id*. at 398. Second, is that Rule valid? *Id*. If the answer to both these questions is yes, we avoid the messiness of the more difficult *Erie* doctrine. *Id*. And there, a plurality of justices agreed that New York state could not rewrite class action requirements in contravention of Federal Rule 23. In effect, where a state law and a Federal Rule conflict, the Supremacy Clause compels the Federal Rule prevail. U.S. Const. Art. VI cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . .").

---

[5] While the majority describes this viewpoint as a "growing consensus," Maj. Op. at 12, that consensus only includes two circuits finding *Shady Grove* precludes application of state-law certificate of merit requirements, hardly a rousing rabble of followers. In fact, other circuits have come out on the opposite side in favor of upholding certificate of merit requirements in federal court. *See Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 262–64 (3d. Cir. 2011) (concluding that no Federal Rule conflicted with a state's certificate of merit requirement and that the requirement was substantive under *Erie*); *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1540 (10th Cir. 1996) (same).

But even still, *Shady Grove* was not without criticism. Justice Ginsburg, in dissent, warned that "[o]ur decisions . . . caution us to ask, before undermining state legislation: Is this conflict really necessary? Had the Court engaged in that inquiry, it would not have read Rule 23 to collide with New York's legitimate interest in keeping certain monetary awards reasonably bounded. I would continue to interpret Federal Rules with awareness of, and sensitivity to, important state regulatory policies." *See Shady Grove*, 559 U.S. at 437 (Ginsburg, J., dissenting) (internal citation omitted). While her views did not carry the day, they nonetheless are instructive. When combined with a broad view of what constitutes a conflict, *Shady Grove* runs the risk of undermining federalism and the right of states to determine the substantive requirements for state-law causes of action. *See* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."). In my view, the majority's decision brings to bear the fears Justice Ginsburg articulated in her dissent.

Digging into a *Shady Grove* inquiry here, the Supreme Court has instructed how to determine whether we actually have a conflict between the Federal Rules and a state law. According to the Court, a conflict exists where, "when fairly construed, the scope of [a Rule] is 'sufficiently broad' to cause a 'direct collision' with the state law or, implicitly, to 'control the issue' before the court, thereby leaving no room for the operation of that law." *Burlington Northern R.R. Co. v. Woods*, 480 U.S. 1, 4–5 (1987).

With that as our guide, we proceed to the first *Shady Grove* inquiry—does a Federal Rule of Civil Procedure address whether a West Virginia medical malpractice plaintiff

must serve a certificate of merit prior to filing his FTCA suit? Pledger points to Federal Rules 3, 4, 8, 9, 11, 12, 26 and 37 as answering that question. But we should not miss the breadth of this argument. Pledger uses eight Rules, in effect taking *eight* bites at the apple. *Shady Grove* took *one*. The majority does not go that far but still identifies four Rules as answering the first step of the *Shady Grove* inquiry. Such broad expeditions in search of an answer are inconsistent with a precise wielding of *Shady Grove*. Moreover, this expedition is costly—all at the expense of the Tenth Amendment. Nonetheless, armed with our question in hand, we proceed through the majority's analysis.

Rule 8 sets forth pleading standards. Fed. R. Civ. P. 8 ("A pleading that states a claim for relief must contain: (1) a short and plain statement of the grounds for the court's jurisdiction . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought . . . ."). Under the West Virginia requirement, the majority protests, a plaintiff must "also serve a certificate attesting to the merit of that claim . . . ." Maj. Op. at 15. But I fail to see how pre-suit service of a certificate of merit for an FTCA suit is addressed by a Rule laying out what is required in a pleading. The certificate of merit is not a pleading, nor is it attached to a pleading. How then, could it be governed by a Rule on pleadings? *See Jones v. Corr. Med. Servs., Inc.*, 845 F. Supp. 2d 824, 855 (W.D. Mich. 2012) ("Rules 8 and 9 apply to pleadings only, but Michigan's affidavits of merit have little in common with pleadings, aside from their being filed along with the complaint. Admittedly, the inflexible timing of Michigan's requirement does make this a more difficult question than it would be if the statute allowed an affidavit to be filed sometime after the complaint. But as discussed above, the Michigan courts' treatment of

37

affidavits of merit suggests that they do not fall within the plain language of Rules 8 and 9."). West Virginia's certificate of merit requirement is entirely different and temporally distinct from pleadings. *See id*. at 856. On top of that, the certificate of merit has no "effect on what is included in the pleadings of a case or the specificity thereof." *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 263 (3d. Cir. 2011) (quoting *Chamberlain v. Giampapa*, 210 F.3d 154, 160 (3d. Cir. 2000)). Put simply, finding a conflict here would "expand the Rules' domain beyond their plain meaning to cover nonbinding, factual statements made by a hired expert outside of the formal pleadings." *Jones*, 845 F. Supp. 2d at 856.

Turning next to Rule 9, that Rule imposes heightened pleading requirements in cases alleging fraud or mistake. The majority finds the certificate of merit requirement is a heightened requirement unrelated to fraud or mistake. *See* Fed. R. Civ. P. 9(b). And the majority laments this "'confirms' [the] contrast between the MPLA and the Federal Rules." Maj. Op. at 15. But as with Rule 8, what does pre-suit service of a certificate of merit have to do with pleading? As already stated, a certificate of merit is neither a pleading nor attached to a pleading. *See Liggon-Redding*, 659 F.3d at 263 ("[The state-law certificate of merit requirement] does not govern the content of pleadings or the level of specificity contained therein. The [certificate of merit] . . . is not a pleading and need not be filed until well after the complaint. The [state-law certificate of merit requirement] does not interfere with the pleading standards set forth in Federal Rules 8 and 9. Therefore, these rules can co-exist with the Federal Rules."). Because the West Virginia certificate of merit

requirement and Rule 9 are aimed at different targets, there is no contrast, much less a conflict.

Next, Rule 11, according to the majority, addresses the same issue as the certificate of merit requirement—frivolous filings. Maj. Op. at 16. While I do not disagree with that general statement, the fact that both address frivolous litigation hardly creates a conflict. Just because a Federal Rule serves some overlapping purpose with a state law does not mean the Federal Rule is in direct conflict with state law. What's more, Rule 11, once again, provides pleading requirements, identifying the representations counsel makes in signing a pleading and sanctions for violations. The West Virginia certificate of merit requirement does not address the responsibilities of attorneys in signing pleadings. Also, Rule 11 provides "a pleading need not be verified or accompanied by an affidavit." Certainly, the MPLA does not require that either. Instead, it requires a certificate of merit pre-suit, separate from a pleading. For all of these reasons, there is no conflict between the certificate of merit requirement and Rule 11.

Finally, the majority finds Rule 12 answers the question of whether a West Virginia medical malpractice plaintiff must serve a certificate of merit prior to filing his FTCA suit because it is "sufficiently broad" to control the issue. Maj. Op. at 16. Rule 12 is broad, by design, as it provides for defenses and objections applicable to all civil actions. More specifically, it provides the general categories for which a motion to dismiss can be filed. Fed. R. Civ. P. 12(b). But its breadth and generality does not mean it answers the question before us. Rather, Rule 12 merely points us to general viability requirements of all claims. The majority rightly says the certificate of merit requirement presents an additional hurdle

for plaintiffs to survive dismissal under Rule 12. But many state-law causes of action, however, impose hurdles not specified in Rule 12. For example, the elements of a negligence cause of action are not specified in Rule 12. That does not mean a plaintiff need not plead duty because Rule 12 does not expressly require it. For the same reason, that Rule 12 does not mention a certificate of merit requirement does not render it inapplicable. Nonetheless, under the majority's reasoning, countless state-law requirements would now seem inapplicable because they are not mentioned in the text of Rule 12. This cannot be how this works.

In my view, none of the Federal Rules cited by the majority answer the question of whether an individual bringing an FTCA suit for West Virginia medical malpractice must provide a pre-suit certificate of merit. Illustrating this conclusion, West Virginia state court practice seems at odds with the majority's conclusion that it is "impossible to reconcile" the certificate of merit requirement with procedural rules. Maj. Op. at 17. The West Virginia Rules of Civil Procedure contain language mirroring and nearly identical to the Federal Rules of Civil Procedure discussed above. Yet West Virginia state courts manage to navigate the coexistence of its Rules of Civil Procedure and its certificate of merit requirement all the time. How could they do so if the two conflicted? From this it appears evident, they do so because there is no conflict. The two do not answer the same questions. The two do not collide. The two are not irreconcilable.

In fact, the Federal Rules of Civil Procedure are entirely silent on the subject at hand—a certificate of merit requirement—and there is nothing to indicate they would ever answer such an inquiry. Instead, the Rules contain purely procedural requirements that

40

apply generally to all civil actions. But today, the majority construes the Rules' silence on a certificate of merit requirement as an affirmative mandate that the requirement does not apply in federal court. And on that alone, we can now avoid an *Erie* inquiry. Law students may very well rejoice, as the frequency of conducting an *Erie* analysis diminishes. Never mind that the paradoxical result is that the FTCA and Supreme Court precedent tell us to apply state substantive law, *see* 28 U.S.C. § 1346(b)(1); *Meyer*, 510 U.S. at 478, and yet, under *Shady Grove*, we need not grapple with what "substantive" means. In effect, the line between substantive and procedural is irrelevant so long as a Federal Rule is construed broadly enough to win, regardless of whatever a statute says.

I fear the implications of the majority's decision are quite broad, potentially rendering inapplicable many state-law provisions, even those we consider to be substantive. To be clear, I take no issue with *Shady Grove* as a tool in times of precision, where we have a direct collision and no room for operation of the state law. *See Burlington*, 480 U.S. at 4–5 (holding a conflict exists where, "when fairly construed, the scope of [a Rule] is 'sufficiently broad' to cause a 'direct collision' with the state law or, implicitly, to 'control the issue' before the court, thereby leaving no room for the operation of that law"). But our Constitution demands we refrain from wielding *Shady Grove* imprecisely in situations where there is ample room for a state law.

## II.

Given *Shady Grove* does not answer our inquiry, we must then determine whether the West Virginia certificate of merit requirement is substantive or procedural. To do that,

we instinctively proceed into *Erie*. *Shady Grove* in fact, points us there. *See Shady Grove*, 559 U.S. at 398 (stating we "wade into *Erie*'s murky waters" only if a Federal Rule is inapplicable or invalid). But both *Erie* and *Shady Grove* specifically considered what law to apply when sitting in diversity jurisdiction under 28 U.S.C. § 1332. In both cases, the Supreme Court was concerned with the Supremacy Clause—in effect which of two competing sovereigns supplied the controlling law.[6] By contrast, we have jurisdiction under 28 U.S.C. § 1346(b)(1). Therein lies a confusing assumption, in that "every Supreme Court case to actually apply an *Erie* analysis to a choice-of-law question has been founded on diversity jurisdiction." Alexander A. Reinert, *Erie Step Zero*, 85 FORDHAM L. REV. 2341, 2352 (2017). Certainly, the Supreme Court has suggested *Erie* may well apply to cases beyond diversity jurisdiction. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 159 n.13 (1983) ("[W]here Congress directly or impliedly directs the courts to look to state law to fill in details of federal law, *Erie* will ordinarily provide the framework for doing so."). But even so, these considerations provide no meaningful guidance in the context of an FTCA suit.

---

[6] Here, the implications for the Supremacy Clause are unclear because the FTCA waives sovereign immunity and adopts West Virginia's substantive state law. In effect, the United States wholeheartedly embraces West Virginia substantive law and declines to compete. *See Shields v. United States*, 436 F. Supp. 3d 540, 543–44 (D. Conn. 2020) ("For diversity cases, the extent to which state law applies in federal court turns on consideration of the choice-of-law rules announced in the famous case of *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), and its progeny. By contrast, the FTCA itself instructs the federal courts about the law that they should apply.").

*Erie* made clear that with regards to substantive law in state-law causes of action, "the law to be applied in any case is the law of the state." *Erie*, 304 U.S. at 78. Subsequently, the Supreme Court gave us three considerations to assist in determining whether a state law is substantive or procedural. First, the Court provided the "outcome-determination test" laid out in *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945). And later, the Court told us to consider also "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 428 (1996) (quoting *Hanna v. Plumer*, 380 U.S. 460, 468 (1965)).

These considerations make sense in a diversity action where there is a contest over which sovereign's law should apply and there is a choice of forums.[7] They even make sense in federal question jurisdiction when there is concurrent state court jurisdiction,

---

[7] Certainly, the certificate of merit requirement in the context of a diversity medical malpractice suit could be evaluated under *Erie*. Even still, I am confident an *Erie* analysis would bear out that the requirement is substantive. First, the requirement is outcome determinative on its face. In West Virginia, one can only be held liable on compliance with the requirement. As to the first of the twin aims, forum-shopping, "plaintiffs . . . might well be tempted to try to manufacture diversity of citizenship of parties in order to get into federal court." *See Davison v. Sinai Hosp. of Baltimore, Inc.*, 462 F. Supp. 778, 780 (D. Md. 1978), *aff'd by Davison v. Sinai Hosp. of Baltimore, Inc.*, 617 F.2d 361 (4th Cir. 1980). A plaintiff might well prefer to proceed in federal court to avoid an expensive and time-consuming requirement otherwise required to proceed in state court. Similarly, the requirement implicates the second twin aim, inequitable administration of the laws, because a claim otherwise unviable in state court is nonetheless viable in federal court. Just as *Erie* "precludes a federal court from giving a state-created claim 'longer life . . . than [the claim] would have had in the state court,'" so it also would preclude a federal court from giving a state-created claim new life. *Gasperini*, 518 U.S. at 430 (quoting *Ragan v. Merchants Transfer & Warehouse Co.*, 337 U.S. 530, 533–34 (1949)).

hence a choice of forums.[8] But respectfully, applying the three factors identified by *Erie*'s progeny to an FTCA suit is not at all helpful because there is exclusive federal jurisdiction.

To illustrate, regarding the outcome-determinative test, we ask whether "it significantly affect[s] the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court?" *Guar. Tr. Co.*, 326 U.S. at 109. This metric tells us nothing about an FTCA suit. Because when we consider whether the result of Pledger's litigation would differ in an action upon the same claim by the same parties in a State court, the scenario proposed is impossible. Pledger could never bring the same claim against the same party—an FTCA action for medical malpractice against the United States—in a state court. *See* 28 U.S.C. § 1346(b)(1) ("[T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . ."). Instead, the FTCA provides he may only file in federal court.

Similarly, the twin aims of *Erie* are not helpful. Forum-shopping is irrelevant to our inquiry for the same reason above. Through the FTCA, Congress has ousted state courts of jurisdiction—leaving federal courts the only forum Pledger may "choose." How can this twin-aim of *Erie* guide us if the FTCA contemplates no choice?

---

[8] *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 378 (2012) ("In cases 'arising under' federal law, we note, there is a 'deeply rooted presumption in favor of concurrent state court jurisdiction,' rebuttable if 'Congress affirmatively ousts the state courts of jurisdiction over a particular federal claim.'" (*quoting Tafflin v. Levitt*, 493 U.S. 455, 458–59 (1990)).

Finally, inequitable administration of the laws similarly provides no insight into whether the West Virginia certificate of merit requirement is substantive or procedural. As in forum-shopping, there is only one place where Pledger's FTCA suit can be litigated. Inequity would require some alternate outcome be possible somewhere else—and we simply have no such potential here. Flat out—the requirement either applies in all FTCA suits in West Virginia federal court or does not apply in all FTCA suits in West Virginia federal court. There is no inequity possible where the requirement applies uniformly by way of the FTCA.

In sum, the *Erie* factors identified by the Supreme Court seem meaningless in the face of an FTCA suit. As if we are using the rules of football to determine how to conduct a jump ball in basketball, these factors do not tell us anything that helps us determine whether the West Virginia certificate of merit requirement is substantive or procedural.

But even if the outcome-determination, forum-shopping and inequitable administration of the laws considerations do not help us with our inquiry, we still must find the line between substantive and procedural law here. *Erie*, 304 U.S. at 78 ("Congress has no power to declare substantive rules of common law applicable in a state . . . . And no clause in the Constitution purports to confer such a power upon the federal courts."); *Meyer*, 510 U.S. at 478 ("[T]he 'law of the place' means law of the State—the source of substantive liability under the FTCA."). For several reasons, I conclude the certificate of merit requirement falls on the substantive side of that line.

First, substantive liability only flows from compliance with the state-law certificate of merit requirement. If this were a medical malpractice claim against a private party in

state court, Pledger's claim would have been properly dismissed for failure to comply with the requirement and no liability could attach.

But that is not all. The text of the MPLA and the function of the certificate of merit requirement also point to a substantive determination. Remember the express purpose of the MPLA, to balance two competing interests—"the increase in the cost of liability insurance and . . . [the] access to affordable health care services for [its] citizens." W. Va. Code § 55-7B-1. One way the West Virginia legislature sought to balance those interests is reflected in the certificate of merit requirement. The certificate of merit must be completed by a healthcare provider and must outline the provider's qualifications, the provider's familiarity with the requisite standard of care and the provider's opinions as to both how the standard of care was breached and causation. The West Virginia legislature felt requiring plaintiffs to provide defendants with this substantive evidence of the alleged medical malpractice before a case is even filed would reduce the costs of liability insurance and foster more affordable healthcare by separating the wheat—legitimate claims—from the chaff—illegitimate claims.

Further, receipt of a certificate of merit triggers rights of health care providers. The MPLA provides healthcare providers with the right to demand pre-suit mediation on receipt of a certificate of merit. *See* W. Va. Code § 55-7B-6(g) ("Upon receipt[,] . . . the health care provider is entitled to prelitigation mediation before a qualified mediator upon written demand to the claimant."). While I do not make any determination that such requirement should apply in an FTCA suit, that statutory right reflects an additional substantive

46

delineation, resulting from service of the certificate of merit, to balance the legislature's aims of containing insurance costs and providing affordable healthcare.

To be sure, this question is not clear cut. The West Virginia certificate of merit requirement's placement in the procedural section of the MPLA, and the fact that it is a document that must be served, reflect procedural characteristics. But, in my view, this statutory placement and titling, at best, is offset by the fact this requirement does not appear in the West Virginia Rules of Civil Procedure. Instead, the requirement is located in a statute outlining a state-law cause of action and the boundaries of liability. And regardless of these formalistic matters, any statutory location is outweighed by the substantive characteristics outlined above.

To conclude, without this component of a medical malpractice claim, no plaintiff could prevail and no defendant could be liable. The West Virginia legislature enacted this requirement as a means of establishing a balance between the interests of its citizens and healthcare providers—a quintessential substantive determination. As such, I find this is a substantive law of the state of West Virginia.

## III.

Because no Federal Rule conflicts with the West Virginia certificate of merit requirement and the West Virginia certificate of merit requirement is a substantive law of liability, the district court correctly applied it to Pledger's medical malpractice claim brought under the FTCA. Because Pledger did not comply with that requirement, his claim was appropriately dismissed. For these reasons, I dissent.